May it please the court, counsel. Good morning. The standard for me... Do you want to state your name for the record? Yes, your honor. Thank you. You'll get credit that way. Thank you. My name is Megan Ann and I'm here representing the plaintiffs, Daniel and Katrina Jerden. The standard in this case is abuse of discretion and we have assigned four bases for error in the case. This case basically presents a classic situation where one party lays in the weeds, waiting to kind of attack a situation that really is unfair. What happened is Dr. Gross, who is a neurologist and comes from Colorado, testified about the condition of MS, which is the condition the plaintiff has, and which much of Dr. Gross' testimony he testified as to issues about the fact that MS, how it actually is treated, which is not something that a neurosurgeon treats. It's treated by a neurologist. He also talked about what the percentages of chances were for the plaintiff to have a recovery so that he would go back to baseline if he had not had this unnecessary surgery. So what happened here is that Dr. Gross gave this testimony on the third morning of trial. On the fifth morning of trial, a motion was made by the defendant asking, it was unclear to me what the motion was and apparently it was unclear to the court because it came out in a number of different ways. By that time, by the time the motion had been made at all, there had already been two other expert witnesses who had given testimony. That day continued. Further testimony was given. There was the testimony of another neurosurgeon. There was the testimony of two more neurologists. And then the Memorial Day weekend happened. And when we came back to court on Tuesday, which was the last day of trial, there was a brief rebuttal witness and there was argument about this issue, about what should happen with Dr. Gross' testimony. What the court said was, well, what the defendant argued is that we should have brought in evidence of the locality rule, which is an Oregon rule that basically says if you're, you have to be able to say that you're familiar with the standard or the practice of medicine in a place similar to Klamath Falls. It's not, you don't have to ask the question. If the question isn't asked and it's not objected to, it's waived. Despite that, the court granted that motion for limiting instruction over plaintiff's objections. I thought that there was initially an objection to lack of foundation to Dr. Gross' testimony. There was never. If there was an objection to foundation, would it be required to have Dr. Gross testify that he's familiar with the standard of care of a neurosurgeon in that locality? In a place similar. Your Honor, there was no foundational objection, which went to the issue of locality. And Dr. Gross was allowed to testify at length about the standards with respect to neurosurgeons and neurologists. If the question had been asked, if the objection had been made that there was no objection, I'm sorry, that there was no foundation laid as to the similarity rule, it would have been very simple to fix at the time of the testimony. However, six days later, the day after a weekend holiday, it's not possible to fix that. This is an expert who lives in another location and who I can't easily just call and say, could you come back and testify to this issue so that we can fix this. As I understand the rule, that he should have, the defendant should have asked the question or made the objection at the time, and he did not make the objection at the time. Now, the problem is that, of course, a jury has no way of teasing out something as complicated as this as to what it is that they can consider Dr. Gross' testimony for days later. Excuse me, counsel. Yes, Your Honor. You don't have any cases. This Oregon law applies, right? Yes, Your Honor. Oregon law applies to the substance. Now, do you have any cases that say that the locality objection, which goes to the foundation of the expert witness' testimony, must be made at the beginning of the testimony and cannot be the subject of a motion for limiting instruction later, or else is waived? Okay. I don't have a case that says exactly that, Your Honor. Why do you say that it's waived? Because, Your Honor, the whole point of asking, of not objecting on a foundation question like that is so that he lies in the weeds. Exactly. And, you know, it seems to me that that's exactly the opposite of what the court wants to happen. I mean, this could happen all the time with situations like, I mean, here's a really simple situation. Take a red light situation in a car accident case where someone says, I saw the red light, and later on the other lawyer says, well, they never asked the foundation question, you know, had they seen the light as opposed to what color it was. No, it doesn't go to that at all. Okay. It goes to some clever associate in the defense office saying, she never asked a question about the standard of care in the Oregon locality. Make a motion to limit the testimony based on that. And so that was done. And you're saying, and I'm asking you, is that the type of foundational objection which if not made at the time he testifies as to the standard of care is forever waived? And, Your Honor, I don't have, I can't say, yes, there's actually a case that says exactly that. There is a case called the Mosley case, which is an Oregon case, which talks about, which is on exactly the same point about the locality rule where the defendant did not make the objection and where the court at the end said, well, you know, we're not going to exclude it now. You didn't make the objection. Well, this was tried in federal court, wasn't it? Yes, it was tried in federal court. So the federal rules of evidence are governing the rules of admissibility and foundation, I think. Right. And Rule 103A1 says something about a timely objection or motion to strike stating a specific ground of objection if the specific ground is not apparent from the context. Why isn't that relevant? Well, I believe that does apply, Your Honor, that they should have stated the specific ground and that was one of the bases that we made our objection at the trial level was that it wasn't specific and it wasn't timely, and therefore it's confusing. In addition to that, Your Honor, the way that this instruction was done because it was done at the last minute. Let's pretend that the limiting instruction had been written. Let me ask one question. Is it your position that the defense did not object to Dr. Gross' testimony as to the standard of care for a neurosurgeon? Forget the locality rule. On the basis that Dr. Gross had never done any operations, he was a neurologist, and therefore he had no foundation upon which to state his opinion as to standard of care? No, that's not my intention. Well, wasn't that objection made timely? That objection was made, Your Honor, and I believe that we cured that objection. Under Oregon law, a neurosurgeon or a neurologist can testify as to the standard of care as to one another.  But under California law, you probably would not be able to have a neurologist testify as to the standard of care with respect to a neurosurgeon. But under Oregon law, you can do that. So the judge denied the objection based on Gross being a neurologist and not being able to testify as to the standard of care of a neurosurgeon. Is that correct? That's correct, Your Honor, and I believe what happened is that that was cured in the transcript. I believe that there was an objection to that, and then I asked Dr. Gross a series of questions about the interplay between the neurosurgeon and the neurologist, and the idea being that the neurosurgeon, when he sees the kinds of problems that were indicated in Mr. Jordan's MRI. Your question is the judge overruled the foundational objection that a neurologist should not testify as to the standard of care of a neurosurgeon. True? True. So the only issue is whether then he was properly stricken based on the failure for you to establish that under the locality. Right. That's what's before us. Yes, I believe that is, Your Honor. And the first time that that specific objection, that locality rule objection, was articulated by the defendant came when? On the fifth day of trial, which would have been Friday morning. That was the first time that he stated that the defense stated that they wanted to make some kind of a restriction, but it wasn't clear exactly what the objection is or what it should be stricken about, and that was not made clear until the following Tuesday. So the first mention of the locality rule, is that your argument? It took place on either the fifth day of trial or not until the argument after Memorial Day? That's correct. I'm asking if that's an or. Which day did it happen? I believe that it happened on the day after Memorial Day as to the locality rule. I seem to remember reading in the briefing that the judge may have offered you an opportunity, or that either the judge offered it or else that you had an opportunity to call your witness by telephone. Well, Your Honor, I know that that is in the district court's opinion, where the district court says, I could have done that. There was no opportunity. Nobody said, well, why don't you call him by telephone? The district court didn't initiate that? No. Let me say this, because I see there's about eight and a half minutes left. There are a couple of other issues that were of interest to me. One is the issue of the male nurse testifying about the reading of the MRI or MRA on cross-examination, and the other was the prosthetic eye new trial issue. Maybe you could at least touch on those. All right. Well, I'd like to go to the new trial issue, because I think that I don't have much time left. And as far as the issue about Nurse Bowser is concerned, Nurse Bowser was allowed to testify as to the contents of an MRA, a magnetic resonance angiography, which he stated he was not qualified to testify about. And, of course, this became substantive testimony before the court. I did make an objection to his testifying about that, and as I understand the federal rules, that says that once I've made that objection, that's all I have to do. I don't have to keep making the objection over and over again. Okay. With respect to the prosthetic eye, I was not aware that Dr. Amstutz had a prosthetic eye. After the trial in this matter, I had the very weird experience of being in my office and meeting with a prospective new client who had worked with Dr. Amstutz. And this was, I believe, I'm not sure whether it was four or five days after the trial had concluded in this case. And that person told me that, and this is a declaration which was submitted in support of the motion for a new trial, that she had worked with Dr. Amstutz as an x-ray technician. She had worked at the same hospital, and she had been called repeatedly into the operating room where Dr. Amstutz was and had been asked to point out things on the x-ray. And she had stated that that was something that made her feel uncomfortable because she was an x-ray technician, not a neurosurgeon, and she did not feel comfortable giving that. Your time is short. I think we know the problem. Okay. The question is, why weren't you able to determine that in the course of discovery, particularly when you're sitting across the table presumably taking this deposition, and ability to read correctly is at issue. Right. No foundational questions about vision. Right. Nothing of the sort. Okay. Your Honor, I did sit across the table from Dr. Amstutz. It happened to be quite a large table, which is different from most conference rooms. And during the course of the deposition, which lasted about five or six hours, I asked Dr. Amstutz if he would read some of the MRIs, which he got up and did. Now, I did not notice that he had a prosthetic eye. And I don't, you know, the testimony of the x-ray technician is that she, who worked with him over a period of years, also did not know that he had a prosthetic eye and only knew it sometime while she was working at the hospital when he removed the prosthetic eye after a surgery. That was how she learned about it. In my situation, you know, I wish I had figured it out, but I didn't. And I did get the deposition that was taken of Dr. Amstutz in another matter, and I watched that. It's a CD, which is actually part of the court record. It's a very brief deposition. I believe it's maybe six minutes long. And in that deposition, Dr. Amstutz is asked if he has any health problems, and he says no. So I think even if I had had the opportunity to ask that question, I'm not clear that I would have gotten a different answer than the lawyer did who asked it in the other case. I saw that CD before the trial, and that CD, that deposition transcript, indicated there were no health issues. So I don't. Is it your position that had you known that he had a prosthetic eye, you could have impeached him for his lack of depth perception in reading x-rays? Yes, Your Honor. May I keep a couple minutes? You can keep as much time as you'd like. All right. Well, it looks like I have a little less than four, so thank you. Well, keep talking. It's on your nickel. Court, please. Counsel. I'm Bob Cowling. I represent the defendant in this case. Let me start with the last issue first, if I could, since it's at least fresh in my mind. It has to do with the motion for new trial based on the fact that Dr. Amstutz has one eye. One of the claims in the case was that he misread the x-rays. The jury found that he was not negligent. So either that he was not negligent or that if he misread the x-rays, it didn't cause any harm. So I think there's one of these no harm, no foul situations in a way because this jury found that he read those x-rays correctly, or if he didn't, it caused no harm. How do you know the jury would have found that if he had been examined about his eyesight at trial? Well, I think the standard's the same whether he has one or two eyes. Well, it may be, but how do we know how the jury would have reacted to his testimony? Okay. I want to try to answer this correctly. Someone could have one eye and be a competent neurosurgeon, but someone could have one eye and not be a competent neurosurgeon, and it might affect depth perception. I suppose it could also just affect the quality of the amount of perception because we'd probably get some vision with our strongest eye. So, you know, it depends on the quality of his other eye. And as I understand it, he's gotten through all his exams, and he's a competent surgeon in general and has done many operations. Correct. So he may have had no problem on that. But how do we know how a jury would have reacted to it, given all the evidence? Well, the jury in the case made a decision that the X-rays were read correctly by Dr. Amstutz. In other words, that he did not err in reading those X-rays. So I guess my point would be what difference does it make if he had one or two eyes? He may have based that on that determination. Is there any other evidence to say that he read it correctly? Yes. Our witnesses stated that several times, and all of our witnesses said that. That they would have read it the same. They read them at trial and would have read them the same way Dr. Amstutz. Yes. That they would have read this as a tumor, not as demyelinization. That's correct. Okay, but then there were witnesses on the other side as well. That's true. The jury has to make a choice. I guess one of the questions in my mind is how could cross-examination on the eyesight issue have affected the jury? Do we know, is that enough to entitle the plaintiff appellant to a new trial? You know, there was a, when this issue was raised in the motion for a new trial, we submitted an affidavit that having one eye would have no impact on a person's ability to read a flat film. The depth of perception was irrelevant. There was nothing submitted in opposition to that. Okay. Let me just identify two other issues that are of some concern to me, and you can cover them at any point. That's fine. One is the timing on the objection about the community knowledge of the neurologist, Dr. Groves. The other is the testimony of the male nurse on cross-examination about how he read, you know, what he thought the MRA showed. And I guess relating to those two questions, there's also the juxtaposition of them, meaning in a sense where the judge excluded, as I understand it, told the jury to disregard a neurologist's testimony about what the MRA showed, but let them hear what the nurse thought it showed, who was not licensed or trained, you know, in that sense. Yeah. Okay. So I find that a little troubling. Sure. Okay, if I could, I would like to speak to those issues, and I'll move on to those at this time, unless there's other questions about that new trial issue. Cover it at any point you want. The Dr. Groves, I'll speak to Dr. Groves' situation first. Let me just, if I could sharpen it, because I have the same question. Do you disagree with counsel's assessment that the first time the locale objection was made specific was the day of the hearing after Memorial Day? I don't really agree with that, because that was the point of raising. When was it first specifically mentioned? Well, I objected to Dr. Groves' testimony, some of it while he was testifying, on the basis of lack of foundation. Yeah, that's general. That's a general objection, and it was sustained. So there was no need for me to be more specific. I thought I heard Ms. Annan tell me that the objection on the grounds that lack of foundation because he wasn't a neurosurgeon, was only a neurologist and had no surgery background and therefore could not testify as to the standard of care of a neurosurgeon was overruled. I am not certain that I objected on the basis that he was a neurologist and not a neurosurgeon. My basis throughout his testimony was that he never testified that he was familiar with what a neurosurgeon should do in a community, in Klamath Falls or in a similar community. That was the general lack of foundation, and then you sat down? You didn't say what the foundation was that was lacking? The objection was sustained. Okay, so then what happened after that? Testimony continued to come in, and there was testimony on the subject that Judge Baio has described. That testimony did come in, correct? If you take a look at our supplemental excerpt of record, pages 15 through 16, there's a series of questions there and my objections. The first question started with something to the effect that what would a neurosurgeon see in these x-rays? I objected to that on the basis of foundation. That was sustained. Thereafter, in the next several pages, other questions were asked, but counsel never went back to asking what a neurosurgeon should or should not do. They were rephrased in terms of what a neurologist would do. I think if you take a look at that series of questions and answers, it will cast a little bit different light on where we were on that particular issue. So the testimony that you've referred to, the question shifts to framing it as your opinion as a neurologist. So you're saying that all that came in was opinion as a neurologist, and therefore there was never a cure, as has been argued, that allowed Dr. Gross to opine as to his opinion as a neurologist insofar as it affected a neurosurgeon? He was never directly asked that question. On the timeliness issue, Your Honor, I raised the point that I felt that Dr. Gross's evidence was insufficient. Well, your initial, before we shift on, your objection at page 15 says, on the basis of lack of foundation, lack of qualification as to what a surgeon should do. Neurosurgeons should do, yes. Now, I'm reading the transcript. You can say whatever you want. I'm reading the transcript. Lack of qualification as to what a surgeon should do. That's what it says in the transcript, page 15 in the citation. So I'm accepting that. I'm not sure whether it makes any difference whether you call it neurosurgeon or surgeon. In any event, question, in your practice, did you work with neurosurgeons all the time and so on? Then you renew the objection. Would an ordinary, on the next page, would an ordinarily careful neurosurgeon conclude that what is in these MRIs is suspicious of MS? Objection, same objection, sustained. Okay, then the question shifts to, okay, let's go into your opinion as a neurologist. So that's all directed at the issue Judge Bea has been correctly flagging. So the question before us now is what about the locale objection? Where does that appear in your objection? You've made specific the basis of your objection of foundation tying it to the surgeon versus neurologist. Where's any indicator that now it's the location issue? Well, I raised that issue at the close of Plaintiff's case. Well, that's not a timely objection. It's supposed to be contemporaneous. It's supposed to be specific and contemporaneous. That's clarinized circuit evidentiary law. What good does it do on a foundational question to raise it at the close of Plaintiff's case? That's why the foundational objections are precisely to object to it at the time so that they can be addressed and so that the questioner can either, particularly with an expert, cure or not cure. And you were successful in preventing on the neurosurgeon versus neurologist. So why not the same burden on the locale requirement? Why isn't it waived? I believe it's not waived for this issue, for this reason. An expert witness's testimony on the standard of care is never sufficient unless it includes the locale evidence. And I have no way of knowing at what point she's going to put that into the case. In fact, if you read Dr. Gross' testimony, I'm not sure that he was ever asked the question as to what Dr. Amstutz, as a neurosurgeon, should or should not have done. My motion was simply that the jury should not, with that state of the evidence, they should not be entitled to consider his testimony on the issue of my client, the neurosurgeon's negligence. So your argument is in her case in chief, she failed to lay the evidentiary foundation for an element of her case. That's it. And substantively, there was simply nothing there that related to Dr. Amstutz, what he should or should not have done. May I ask you another question? Do you agree with Ms. Annon that the substantive law of the state of Oregon, as an evidentiary matter, makes relevant the opinion of a neurologist as to the standard of care of a neurosurgeon, unlike California? The answer to that is yes, if the foundation is laid. In other words, in some cases, a chiropractor can testify as to what a medical doctor could do if his practice is such that he's familiar with what is ordinarily done by that particular practitioner under those circumstances. Well, if that's so, then your objection that the lack of surgery barred the opinion of a neurologist as to the standard of care for a neurosurgeon was incorrectly sustained under Oregon law. No, I don't believe that I was. I don't think that I objected to the opinion from Dr. Gross on the basis that he was not a surgeon. That's just what Judge Fisher read, as I thought, from Page. On the basis of lack of foundation, lack of qualification as to what a surgeon. That's right. And he never testified that he knew what a surgeon should or should not do. Well, of course he didn't, because your objection was sustained. Well, he was not asked that question. It doesn't make any difference that he was not a surgeon. I agree with that. He can express opinions under certain circumstances, but they have to lay the foundation. There are a couple of foundation issues here. One, he has to say he knows what a neurosurgeon should or shouldn't do if he wants to give expert testimony in this case. But that's a catch-22 situation. You didn't allow him to testify what a surgeon should do because he didn't have the foundation of a surgeon. Well, I think his question had to do with what a neurosurgeon should do. My objection was on the basis that he had not provided any proof up to that point that he knew. Because he. Oh, I see. You would have been you would have not objected. Had Ms. Allen said, let me go into the experience that this neurosurgeon, neurologist has from his observation of what neurosurgeons do. That's that's the foundation that was lacking at the time I made that particular objection. Ultimately, there was never any testimony that this doctor was aware of what a surgeon should or should not do. And in a locality like this, that's the other foundational deficit. Sometime in your argument, I hope you'll address the other issue that was of concern to me about the nurse testifying. Sure. I mean, I still find it a striking juxtaposition that the judge instructs the jury not to consider the neurologist's reading of the M.R.A., but lets them ponder what the nurse thinks. Your Honor, being told that part of the told that the nurse wasn't licensed to interpret. The jury was not instructed to disregard what this neurologist thought about the x-rays. In other words, that that wasn't they could consider that for what whatever it was worth. So but but getting back to nurse Bowser, there's two things. And this has to do with gross weight under the instruction on that point, under the instruction to the jury, the limiting instruction. The jury could not consider what Dr. Gross said about reading the chart as it would relate to negligence at all. Not to consider his testimony as it related to prove that Dr. Amstutz was negligent. So that so that if Dr. Gross testified, a normal reading of this chart would be demyelinization tumors remote, which would support a negligence claim that the jury couldn't consider. But it was permitted to consider the nurses cross-examination that he read this to be a tumor. The verdict form applies. There's a argument we have on the verdict form that you simply can't tell how the jury decided the case. That applies to both Dr. Gross's testimony and nurse Bowser's. OK. On nurse Bowser's testimony, if you look at plaintiff's direct examination, plaintiff's counsel examined nurse Bowser concerning what he saw in the MRI and in the MRA. And my questions were simply a response to that. So in that sense, they opened the door. And then the third, and this is not a substantive argument, is that there was never really a direct objection to nurse Bowser testifying as to what he saw in those x-rays. Having said all of that, nurse. I thought that there was an objection to his testifying. I think it's, you know, my feeling is. I'll go back and take another look at that. Yeah. I think we set that forth in our brief and it can be followed there. But but whether Bowser was entitled to say what he saw in the x-rays, I think I think he was because he testified that that's part of his job, even though he's not qualified to, quote, interpret and charge for x-rays. He does as part of his function. He looks at x-rays and he talks it over with Dr. Amstutz. Certainly a jury is not going to think that it has as much weight as other people. But that just goes to the way. Wasn't there a couple of defense experts who testified the same as Bowser? Absolutely. And they were neurosurgeons. We had a neurosurgeon and a neurologist. Right. Thank you. Thank you. Judge Beehive, one of the questions that you asked that I think was I probably did not answer appropriately on when I initially was arguing was the question of whether or not the judge overruled the neurosurgeon versus the neurology. I believe that when that objection was made that it was cured on the record and that I then went on to ask questions about neurosurgery and neurology as opposed to the judge saying, like, overrule it. What happened is that in the record at 181 of the excerpts and at page 16 where I go on to ask Dr. Gross questions, Dr. Gross, in your opinion, based upon your experience in training, would an ordinarily careful neurosurgeon conclude, and then Mr. Cowling objects, and then I ask him more questions, and then Mr. Cowling objects again, and then Mr. Cowling withdraws his objection, and then I go on to ask questions that involve neurologists. As to ñ Well, that's not the issue. I thought you were ñ he's asked as a neurologist, okay? Right. And that's what ñ I mean, you stop at ñ you're asking his opinion as a neurologist. And a ñ And your experience as a neurologist. Right. And his experience in working with neurosurgeons and what neurosurgeons do when they encounter MRIs that are suspicious of MS. And then, Your Honor, the issue of the admissibility of one healing art for another in neurosurgeon versus neurology is an Oregon case called Creasy versus Hogan, which I believe is cited by the parties in the briefing. It's 292 Oregon 154. And finally, the fact is that when this limiting instruction was given, because of the timing of it, it somehow became part of the jury instructions, which is exactly where it ended up. It ended up in the middle of the jury instructions because he asked for the limiting instruction on the last day of trial as we were putting the jury instructions together. That instruction came out. It became part of the jury instructions. And you objected to it under Rule 51? I did not object to it under Rule 51, Your Honor. I had objected to it on the basis of the limiting instruction for a lengthy argument shortly before that. And the rule under Brown v. Adhamco states that when it would be futile to make the objection again, it's not necessary to do that. Well, it seems to me that looking at the instruction, it's imprecise. That is, it doesn't tell the jury in what limited respect Dr. Gross' testimony may be considered, nor does it help them really understand what goes into a negligence case. Are you saying that all of that colloquy preceding the limiting instruction made that very point, that you made that very point? Yes, Your Honor. I mean, the limiting instruction, the arguments that I made during the limiting instruction were about specificity, timing, and the fact that it couldn't be cured and that it's confusing. And then the instruction somehow became part of the jury instructions because that was the next thing that happened in the trial is the jury instructions come out. And, you know, frankly, limiting instruction and jury instruction, the only thing they have in common is that their second word is the same. And somehow this instruction ended up in the middle of the jury instructions, which then gave it, again, a very undue weight because it gives the impression that the judge is saying that there is something wrong with Dr. Gross. And finally, my last 17 seconds, the case of Dorn v. Burlington, which is this court's fairly recent case, I believe actually from this year, talks about when there are so many errors of law that one side is prejudiced and that it's appropriate to give a new trial under those circumstances. And plaintiffs request that. Thank you, Your Honors. Thank you. Thank you, counsel, both of you, for your arguments. The case in charge is submitted.
judges: Fisher, Gould, Bea